1

Judge Robert S. Lasnik

2

3

4

5

6

7

UNITED STATES DISTRICT COURT FOR THE

8

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

9

10

UNITED STATES OF AMERICA,

NO. 2:23-cr-000147-RSL

11

Plaintiff

UNITED STATES SENTENCING

12

v.

MEMORANDUM

13

SAJED AL-MAAREJ

14

Defendant.

15

16

17

18

19

20

21

22

23

24

25

26

27

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**Table of Contents**

I.    BACKGROUND…………………………………………………………Page 3

    A.    Offense Conduct……………………………………………..……Page 3

        1.    Refunding fraud surged during the pandemic………………..Page 3

        2.    Al-Maarej started Simple Refunds in 2020…………………..Page 4

        3.    Al-Maarej built a sophisticated infrastructure to organize
            his fraudulent refund business…………………………………Page 7

        4.    Al-Maarej mastered certain refunding methods such as
            "VC1 instant" and boasted about his successes……………...Page 9

        5.    When Al-Maarej completed a fraudulent refund, he
            demanded payment and then posted a "vouch"……………...Page 12

        6.    As Simple Refunds popularity grew, Al-Maarej relied
            on "workers" to help him manage the load…………………..Page 14

        7.    Al-Maarej launched a Simple Refunds mentorship
            program……………………………………………………….Page 15

        8.    Vidal joined the Simple Refunds team in summer
            2022, and Al-Maarej began stepping back…………………..Page 15

        9.    Al-Maarej personally gained more than $1.7 million
            from the Simple Refunds scheme…………………………….Page 16

            a.    *Retailers lost $2,951,090.77 to Simple Refunds*
                *and Al-Maarej personally collected at least*
                *$387,037.16 of that in*
                *fees*……………………………………………Page 16

            b.    *Al-Maarej stole an additional $1,402,728.96*
                *from victim retailers through his personal*
                *refunding*…………………………………………..Page 18

        10.    Al-Maarej spent the fraud proceeds on jewelry, a car,
             a condo, and expensive travel………………………………..Page 20

    B.    Procedural History…………………………………………….Page 20

II.    STANDARDS OF PROOF AT SENTENCING……………………….Page 21

III.    SENTENCING GUIDELINES CALCULATIONS……………………. Page 22

    A.    Loss Calculation……………………………………………..…Page 22

**Table of Contents**

1. Vouches ($2,951,090.77)…...…………………………………..Page 23

2. Personal Refunding ($1,402,728.96)………………………...Page 24

B. Leadership……………………………………………………..Page 26

1. Al-Maarej was a leader…………………………………….Page 26

2. Al-Maarej was an organizer……………………………….Page 28

3. The fraud involved five or more participants or was otherwise
extensive……………………………………………………..Page 30

C. Uncontested guidelines calculation…………………………….Page 31

D. Summary of Al-Maarej's guidelines calculation……………………Page 31

IV. RATIONALE FOR SENTENCING RECOMMENDATION……………...Page 32

A. Al-Maarej's offense was serious…………………………………Page 32

B. A lengthy prison sentence is necessary to promote respect
for the law and deterrence……………………………………….Page 35

C. The requested sentence provides restitution to the victims…………Page 37

V. FORFEITURE………………………...…………………………………Page 37

VI. CONCLUSION…………………………………………………………..Page 41

1    Sajed Al-Maarej convinced his hundreds of online followers that the only way to
2 get ahead in life is to lie, cheat, and steal. Al-Maarej implemented this theory with
3 devastating results: He cultivated a criminal business that peddled "refunding fraud,"
4 where a purchaser orders an item from an online retailer, receives the item, and then
5 misrepresents the status of the item to the retailer to secure a full refund, while also keeping
6 the ordered item. PSR ¶ 10. He publicized his fraud to thousands on Telegram. He enticed
7 others to join his scheme, ultimately training future criminals as part of a mentorship
8 program. In the end, Al-Maarej and his acolytes stole more than $4.3 million from victim
9 retailers around the country.

10    Al-Maarej called his criminal business Simple Refunds. He ran a group of Telegram
11 channels with that name, which allowed him to promote the fraud publicly to hundreds of
12 retail customers, or "purchasers." He told purchasers he could help them get high-value
13 items for free through "refunding." The scheme was simple: A purchaser placed an order
14 with a victim retailer for a high-dollar item, oftentimes expensive electronics the purchaser
15 believes he could sell on the secondary market. The purchaser then solicited a fraudulent
16 refund through the Simple Refunds Telegram channel. The purchaser provided Simple
17 Refunds with their order and retailer account information. Al-Maarej or one of his staff
18 used this data to log into the purchaser's account and fabricate a story relating to the item
19 to obtain a full refund for the purchaser, while also permitting the purchaser to keep the
20 ordered product. The purchaser then paid Al-Maarej a percentage of the value of the
21 refunded items—typically 15% or 25% of the total cost of the order—through a mobile
22 payment service or cryptocurrency. Al-Maarej operated the Simple Refunds Telegram
23 channel between about September 2020 and December 2022, when he sold the Telegram
24 channel to his co-schemer Leonardo Vidal. During this time, Simple Refunds defrauded
25 victim retailers by more than $2.9 million.

26    While Al-Maarej was running Simple Refunds, he was also obtaining fraudulent
27 refunds for himself and selling the goods for profit. Al-Maarej's personal refunding was so

United States' Sentencing Memorandum - 1
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

prolific, one retailer identified more than $500,000 in items shipped to Al-Maarej's home for which Al-Maarej obtained fraudulent refunds. In total, Al-Maarej made (and retailers lost) more than $1.4 million to his personal refunding activities.

In September 2023, the government charged Al-Maarej in an eight-count indictment with conspiracy to commit wire and mail fraud (Count 1), wire fraud (Counts 2 – 5), and mail fraud (Counts 6 – 8). Dkt. No. 1. Al-Maarej pled guilty to all eight counts without a plea agreement in July 2024. The parties requested an evidentiary hearing so the Court can resolve three disputed issues at sentencing: the amount of fraud loss, whether Al-Maarej deserves an aggravating role adjustment under USSG § 3B1.1, and forfeiture.

The government will present the testimony of FBI Investigative Analyst Margaret Haynes and FBI Forensic Accountant Aireen Agbayani at sentencing. IA Haynes will explain that Al-Maarej led a team of "workers" who helped him run Simple Refunds, and whom he identified in public posts on the Simple Refunds Telegram channel. IA Haynes will testify that Al-Maarej led Simple Refunds in myriad of other ways too, rendering him an "organizer or leader" under USSG § 3B1.1(a). FOA Agbayani and IA Haynes will testify that Al-Maarej's fraudulent scheme caused more than $4.3 million in losses to affected retailers: about $2.9 million in Simple Refunds-attributed losses, and an additional $1.4 million in personal refunding. This entitles Al-Maarej to an eighteen-point increase under USSG § 2B1.1(b)(1)(J). These witnesses will also testify that Al-Maarej personally obtained approximately $1,789,766.12 in proceeds from the fraud, which are subject to forfeiture.

The government agrees with the United States Probation Office that Al-Maarej's total offense level is 30, and he is in criminal history category I, which yields a guidelines range of 97 – 121 months. PSR ¶ 47. But a guidelines sentence is not necessary in this case given Al-Maarej's youth and the likely deterrent effect of a lower sentence. The government therefore requests the Court sentence Al-Maarej to 78 month in prison, three years of supervised release, order restitution in the amount of $4,353,819.73, and enter a

United States' Sentencing Memorandum - 2
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

forfeiture money judgment totaling $1,789,766.12.

## I.    BACKGROUND

**A.    Offense Conduct**

**1.    Refunding fraud surged during the COVID-19 pandemic.**

Al-Maarej was one of a community of "professional refunders," who operated online services that executed refunding fraud on a massive scale. PSR ¶ 11. Professional refunders sold refunding fraud as a service: They claimed they could obtain fraudulent refunds on behalf of their customer / purchasers by impersonating the purchaser with the victim retailer. *Id.* They advertised publicly on social media channels such as Telegram and Discord, claiming "refunding" is a safe, easy, and effective way to make money. *Id.* They enticed prospective customers with images of fancy cars, jewelry, and cash.

Professional refunders used various "methods" to defraud victim retailers. For example, a refunder falsely informed the victim retailer that a purchaser's products did not arrive, convincing the retailer to issue a refund for the supposedly lost product. *See* Haynes Aff. ¶ 22. "Return to Sender" or "instant" was a method in which refunders used mail carrier staff to input false "Return to Sender" scans in the package tracking history, which triggered an automatic refund from the retailer or payment processor. Haynes Aff. ¶ 24. These refunding "methods" were akin to trade secrets of the professional refunder and were closely guarded. Haynes Aff. ¶ 6.

The end goal of each of these misrepresentations was to deceive the retailer into (a) believing the purchaser had returned (or intended to return) the product or there was a problem with the product's delivery, and (b) issuing a refund to the purchaser for the item. PSR ¶ 20. In reality, as the "professional refunder" well knew, the purchaser received the item, and through the fraudulent refunding process, kept both the item and the value of the fraudulently induced refund. *See id.*

Many professional refunders organized their scheme on Telegram because it allowed them to reach a large audience, while affording some level of anonymity. Haynes

Aff. ¶ 3. Telegram is a cloud-based messaging service that users can access through an application on their mobile device or computer, or through the web. PSR ¶ 11. Telegram enables users to disseminate messages to large groups through channels, which can have an unlimited number of members. Channels can be public or private. *See* Haynes Aff. ¶ 9. Public channels have a permanent uniform resource locator (URL), which enables easy sharing, search, and discovery. *Id.* Only the channel's creator or someone the creator has designated as an administrator may post content to a Telegram channel. Posts may be anonymous or signed by the administrator who wrote the post. PSR ¶ 11.

Refunding fraud surged during the pandemic, when demand for e-commerce increased at the same time shutdowns and supply chain challenges forced retailers to minimize warehouse staff. A retailer located within the Western District of Washington told law enforcement that it discovered it had an issue with refund fraud when it started receiving empty packages at its warehouses. Haynes Aff. Ex. 115. Due to short staffing at those warehouses during COVID, the retailer issued an automatic refund once a package was scanned at UPS. *See id.* The retailer learned that professional refunders manipulated this practice by ordering high-value items, falsely claiming they would return the item, and returning an empty box instead. *Id.* This retailer estimated it had lost $23 million to refunding fraud in just a few months. *See id.* The retailer identified refunding fraud as its "number one fraud problem right now." *Id.* at 3.

### 2. Al-Maarej started Simple Refunds in 2020.

Capitalizing on this pandemic-related surge, Al-Maarej started his own fraudulent refunding service, Simple Refunds, in 2020. Haynes Aff. ¶ 12; PSR ¶ 12. Simple Refunds operated on two Telegram channels: The Simple Refunds "main" Telegram channel and the Simple Refunds "vouches" Telegram channel. Haynes Aff. ¶ 9. Both channels were public, meaning they were accessible to anyone with an Internet connection. *Id.* The self-proclaimed owner of the Simple Refunds Telegram network operated online as "@sxjed," as shown below. Haynes Aff. ¶ 13 & Ex. 101, at 1.

United States' Sentencing Memorandum - 4
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970





@sxjed is Sajed Al-Maarej. Haynes Aff. ¶ 14; PSR ¶ 12.

Al-Maarej used the Simple Refunds main Telegram channel to advertise his services and provide updates about the stores Simple Refunds could defraud. Haynes Aff. ¶ 15. There were hundreds of posts on the Simple Refunds main channel under Al-Maarej's leadership. Haynes Aff. ¶ 16. These posts ranged in content from updates on the direction and management of Simple Refunds, directions on how followers could participate in an aspect of the fraud, guidance on how to avoid detection by victim retailers, and updates on Al-Maarej's work schedule. Haynes Aff. ¶ 15 & Ex. 101. Below are a few examples:

United States' Sentencing Memorandum - 5
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970





Haynes Aff. Ex. 101, at 15, 17.

Al-Maarej also frequently taunted his victim retailers and touted his own skill in obtaining fraudulent refunds, as shown in the following examples from the spring of 2022. Haynes Aff. ¶ 15.

United States' Sentencing Memorandum - 6
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



Haynes Aff. Ex. 101, at 14, 23. He did so in part to entice purchases to use his refunding services over other, competing channels.

Although Al-Maarej worked with co-conspirators, he authored every single post on the Simple Refunds main channel between December 2021 (when the channel launched) and June 2022. Haynes Aff. ¶ 16.

### 3.  Al-Maarej built a sophisticated infrastructure to organize his fraudulent refund business.

Once a Simple Refunds customer purchased the product they desired to refund, they provided Al-Maarej and workers the information Simple Refunds needed to obtain the fraudulent refund. Before February 2022, Al-Maarej collected this order information through private "direct messages" on Telegram and Discord. *See* Haynes Aff. Ex. 101, at 7. At some point this method became overwhelming due to the volume of orders. So, Al-Maarej created a Google-based order intake system for Simple Refunds. Haynes Aff. ¶ 26 & Ex. 101, at 7; PSR ¶ 24.

United States' Sentencing Memorandum - 7
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

On February 23, 2022, Al-Maarej posted on Telegram: "NEW GOOGLE FORM HAS BEEN ADDED, ALL ORDERS MUST BE SENT THROUGH FORM STARTING TODAY, DUE TO VOLUME OF ORDERS I'VE BEEN GETTING DO NOT SEND ME ORDERS THROUGH DM, NEW GOOGLE FORM WILL ALLOW YOU TO RESPOND MORE THEN ONCE." Haynes Aff. ¶ 27 & Ex. 101, at 7. Al-Maarej displayed a link to the Google Form in the banner pinned to most posts on the Simple Refunds main Telegram channel going forward. Haynes Aff. ¶ 28.

A purchaser who clicked the link was brought to a Google Form into which they submitted the information Al-Maarej and his workers needed to complete the fraudulent refund. *See* Haynes Aff. Ex. 106. That information included the purchaser's Telegram username, information on whether the order had been delivered, the store name, the purchaser's email and login information for the retailer, the order number, and the order dollar amount. *Id.* The information populated to a Google spreadsheet hosted by the email account Al-Maarej used to run Simple Refunds (sxjed11@gmail.com). Haynes Aff. ¶ 30 & Ex. 107.

Law enforcement seized several versions of the Simple Refunds orders Google spreadsheet as part of its investigation into Al-Maarej and Simple Refunds. *See* Haynes Aff. ¶ 31 & Ex. 108. The orders data is an accounting of Al-Maarej's fraudulent activity—it shows the dates, times, amounts, and basic order information associated with each fraudulent transaction that comprised Al-Maarej's scheme. Haynes Aff. Ex. 108. The orders spreadsheet shows that Simple Refunds purchasers requested about $2.9 million in fraudulent returns in just ten months in 2022 (February 22 – December 28). Haynes Aff. ¶ 32.

Al-Maarej and his co-conspirators also maintained a list of retailers they learned through trial-and-error they could defraud. *See* Haynes Aff. ¶ 33 & Ex. 109. That list informed prospective customers how to work with Simple Refunds to successfully defraud the victim retailers, such as the maximum order amount, how long the refund would take,

United States' Sentencing Memorandum - 8
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

and any notes. *Id.* The last page of the store list shows F.A.Q.s in which Simple Refunds falsely tells its customers that they cannot get in trouble for refunding fraud. *Id.*, at 12.

**4.      Al-Maarej mastered certain refunding methods such as "VC1 instant" and boasted about his successes.**

A professional refunder's methods were akin to trade secrets in this criminal business—they were closely guarded, and refunders boasted about their methods to garner attention, respect, and more customers. Haynes Aff. ¶ 6. Al-Maarej tested refunding methods, prodding the victim retailers' weaknesses to determine which lies would work best to trick the retailer into issuing an undeserved refund. As with the rest of the fraud, all of this played out publicly on the Simple Refunds Telegram channel. For example, in February 2022, Al-Maarej posted "If any refunder wants to buy FWRD method dm me, my vouches speak for itself." Haynes Aff. Ex. 101, at 5.

Al-Maarej frequently posted on Telegram about refining stores and methods. For example, as shown below, he boasted about perfecting a five-day refunding method that worked only on VC1. Haynes Aff. Ex. 101, at 1. In the second image below, Al-Maarej counsels his followers how to defraud VC3, even encouraging them to participate in the fraud with a "special deal" for "refunders that bring me 10+ Orders a week." Haynes Aff. Ex. 101, at 4.

United States' Sentencing Memorandum - 9
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



With his methods refined, Al-Maarej would deploy them to defraud a victim retailer on behalf of a Simple Refunds customer. One method Simple Refunds used was "did not arrive," or DNA. Al-Maarej or a Simple Refunds worker contacted the victim retailer on behalf of the purchaser and claimed the purchased items did not arrive, when in fact they did. *See* Haynes Aff. ¶ 22. The retailer believed the lie and issued the refund. *Id.*

Al-Maarej also worked with insiders at shipping companies to insert fake information into a package's tracking history, which persuaded the retailer the package was lost in transit (as Al-Maarej falsely claimed). *See, e.g.*, Haynes Aff. ¶ 23 & Ex. 104. For example, Exhibit 104 to the Haynes Affidavit shows the tracking history for a package shipped to a Simple Refunds customer who requested Simple Refunds' assistance with a fraudulent return. *Id.* The tracking history shows the package was delivered (and a signature obtained) on March 30, 2022 in the Northwest United States. *Id.* at 3. The next day, the "claimant refused" the package in France—an obviously false scan. *Id.* UPS flagged the transaction for fraud, but not before the retailer issued Al-Maarej's customer a

United States' Sentencing Memorandum - 10
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

fraudulently obtained refund, and Al-Maarej took his cut. Al-Maarej even purchased computer scripts—relatively simple sets of instructions to automate manual processes—to facilitate fraudulent refunds for victim companies including VC5. Giboney Aff. Ex. 312.

In the spring of 2022, Al-Maarej mastered a refunding method called "Return to Sender" / "VC1 Instant." Al-Maarej and others figured out that VC1 issued an automatic refund as soon as a shipping company—usually UPS or USPS—entered a scan that the item was "returned to sender." Haynes Aff. ¶ 24. So, Al-Maarej worked with employees at those shipping companies to input false return to sender scans in Simple Refunds-associated packages. *Id.* For example, a Simple Refunds purchaser requested Al-Maarej's assistance refunding the item whose tracking history is shown below.

| CONTAINER CLOSE | C1 | 05/15/2022 | 04:28 | CITY OF INDUSTRY, CA 91715 | Container Generated | S018604053 | | 05/15/2022 07:10:16 | Container ID: 99P917542FD0005CF-11350210587 Container Type: BMC/OTR |
| ENROUTE/PROCESSED | 10 | 05/15/2022 | 00:33 | CITY OF INDUSTRY, CA 91715 | Scanned | USS-001 | | 05/15/2022 02:42:09 | |
| RETURN TO SENDER | 28 | 05/14/2022 | 14:53 | NEW YORK, NY 10001 | Keyed | MDD TR C161A08530 (interface type – wireless) | Scanned by route 0001C007 | 05/14/2022 13:56:09 | GEO Location Data Available |
| FORWARD EXPIRED | 24 | 05/14/2022 | 14:52 | NEW YORK, NY 10001 | Keyed | MDD TR C161A08530 (interface type – wireless) | Scanned by route 0001C007 | 05/14/2022 13:56:13 | GEO Location Data Available |
| SHIPMENT ACCEPTANCE | TM | 05/13/2022 | 15:22 | LOGAN, UT 84321 | System Generated | | Scanned by route 4321C099 | 05/13/2022 20:04:08 | |
| PRE-SHIPMENT INFO SENT TO USPS | MA | 05/13/2022 | 14:15 | LOGAN, UT 84321 | Manifest Generated | | Destined to route C004 | 05/13/2022 14:15:13 | Length: 16 inch(es) Width: 12 inch(es) Height: 6 inch(es) Weight: 18 lb(s) 0.00 oz(s) |

Haynes Aff. Ex. 105, at 3. Al-Maarej hired a USPS employee to insert the highlighted "return to sender" scan, which triggered an automatic refund from VC1. The purchaser received the item as expected and kept both the item and the fraudulently obtained refund, while providing Al-Maarej his fee.

Al-Maarej frequently boasted about his success with the VC1 instant method. For example, on April 15, 2022, Al-Maarej posted: "[VC1] In-transit & Instant Refunds is the hottest thing in the refunding market as of right now the past 6 days starting from April 9th

United States' Sentencing Memorandum - 11
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

till today we've closed $166,000 in refunds of [VC1] MacBooks and other items Amazon ships via UPS. I'll post the vouches page incase you wanna count for yourself." Haynes Aff. Ex. 101, at 18. He even offered deals and giveaways for purchasers to encourage them to participate in this aspect of the fraud. In April 2022 he offered a discount fee of 18% on all VC1 MacBooks. Haynes Aff. Ex. 101, at 15. Later that month, Al-Maarej offered a $500 Bitcoin raffle for followers who placed a VC1 order they fraudulently refunded with Simple Refunds. Haynes Aff. Ex. 101, at 16.

> **5.** **When Al-Maarej completed a fraudulent refund, he demanded payment and then posted a "vouch."**

Al-Maarej charged Simple Refunds customers a percentage of the value of the refunded product for his fraudulent refunding services. Throughout the fraud, that percentage typically ranged from 15% to 25% of the order total. *See* Haynes Aff. ¶ 38 & Ex. 109. Payment was required within 24 hours of confirmation. *Id.* Simple Refunds accepted various peer-to-peer payment methods, including Zelle, Venmo, CashApp, and payment by cryptocurrency. *Id.* Al-Maarej accepted many of these payments directly to his personal bank accounts. *See* Agbayani Aff. ¶¶ 7–8.

Once Simple Refunds completed a fraudulent refund for a customer, Al-Maarej or one of his workers would post proof of the refund to the Simple Refund "vouches" subchannel. *See* Haynes Aff. ¶¶ 41–42. Each vouch is an image of a successful refund, usually in the form of a screenshot from the confirmation email sent to the purchaser's email account. *Id.* ¶ 42. Below are several examples of Simple Refunds vouches:

United States' Sentencing Memorandum - 12
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



Haynes Aff. Ex. 113. As shown in those examples, many vouches include a "refund total," showing the precise dollar amount of the fraudulently obtained refund. Others show a boast from Al-Maarej that includes an approximate dollar amount of the successful refund, such as "$4.3 Ring.com ✅." Haynes Aff. ¶ 44 & Ex. 113, at 2. There were thousands of posts on the Simple Refunds vouches Telegram channel during Al-Maarej's leadership. *Id.*

Vouches served several purposes in the refunding world. They lent legitimacy to Al-Maarej's criminal enterprise by proving to prospective purchasers that he could do what he claimed, namely, defraud the victim companies. Haynes Aff. ¶ 42. The vouches channel also provided Al-Maarej an outlet to catalogue his successes. As Al-Maarej explained in February 2022, "Please join our vouches page if you haven't done already, we've done over $1 Million in refunds and we don't like spamming our announcements page." Haynes Aff. Ex. 101, at 8.

Vouches are therefore a public accounting of which victim retailers Simple Refunds

United States' Sentencing Memorandum - 13
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

successfully targeted and by how much. The government tallied vouches posted on Simple Refunds under Al-Maarej's leadership (between June 2020 and December 28, 2022) and captured the results in an Excel spreadsheet. Haynes Aff. ¶¶ 45–50 & Ex. 114. Simple Refunds successfully defrauded more than fifty victim retailers during this timeframe. *Id.* Those retailers lost **$2,951,090.77** to the Simple Refunds scheme. Haynes Aff. ¶ 48 & Ex. 114. The retailers that suffered the most losses are located within the Western District of Washington. Haynes Aff. ¶ 51.

> **6.     As Simple Refunds' popularity grew, Al-Maarej relied on "workers" to help him manage the load.**

Simple Refunds received more than 1,000 requests for assistance with fraudulent refunds between February and December 2022. Haynes Aff. Ex. 108. March, April, May, and June 2022 were the busiest months. *Id.* In April 2022, Simple Refunds received 216 orders for fraudulent refunds, meaning Al-Maarej needed to process more than seven orders per day to keep up. *See id.*

Beginning in March 2022—when orders were reaching a fever pitch—Al-Maarej started posting about "workers" who helped him run Simple Refunds. For example, in early March 2022, he told his followers that he would be taking a vacation later that month, but that "my workers will be doing orders." Haynes Aff. Ex. 110, at 1. A few days later, he identified a particular worker to whom he would delegate management of the Simple Refunds orders data while he was gone: "If you want updates on your order please message my worker @KOJxx (HE IS THE ONLY ONE THAT HAS ACCESS TO THE GOOGLE FORM)." *Id.* at 2. Al-Maarej repeatedly told his followers that his "workers" were processing orders. *Id.* at 3, 5. In April 2022, Al-Maarej explained that he was "teaching new worker today." *Id.* at 4.

Al-Maarej also attempted to recruit store workers "that will work with us to give us insight and process refunds," and UPS employees to assist with fraudulent refunds. Haynes Aff. ¶ 35 & Ex. 111.

United States' Sentencing Memorandum - 14
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**7.      Al-Maarej launched a Simple Refunds mentorship program.**

In May 2022, Al-Maarej expanded his fraudulent enterprise by launching a "mentorship program" for his followers. Haynes Aff. ¶ 36 & Ex. 112, at 1. The mentorship program was fraud school: Al-Maarej told his thousand followers that they could "Learn from the best in the game, from everything fraud related, to legit businesses and cleaning your money." *Id.* Al-Maarej claimed he would instruct the limited number of participants on refunding methods like VC1 "in transit, . . . third-party refund methods, [and] . . . instant paypal." *Id.* Participants would get exclusive "[a]ccess to our UPS, USPS insiders and future carrier related insiders once they're available," as well as "20+ successful refunders that have refunded hundreds of THOUSANDS in the past month alone." *Id.* Al-Maarej touted the success of a former pupil, Ressu (i.e., Leonardo Vidal): "One of our huge successes was 'Ressu Refunds', he started last year with us and now is close to being a millionaire this year, if you don't believe me you can ask ressu yourself." *Id.* Graduates of the program could create their own refunding business or "have a chance to work for us and get paid until you're ready to be on your own." *Id.*

Al-Maarej charged $6,000 for the mentorship program. As with the Simple Refunds fees, mentorship participants paid Al-Maarej directly. Agbayani Aff. ¶ 8.

**8.      Vidal joined the Simple Refunds team in summer 2022, and Al-Maarej began stepping back.**

Al-Maarej's co-conspirator Leonardo Vidal joined the Simple Refunds team in June 2022. PSR ¶ 26. Al-Maarej helped train Vidal in the first Simple Refunds mentorship program that Al-Maarej and another refunder (using the moniker "Reign") hosted on Discord. *Id.* Al-Maarej and Reign taught Vidal about refunding, and Vidal later used these lessons to launch his own refunding service called Ressu Refunds. PSR ¶ 26. Between June and December 2022, Vidal and Al-Maarej ran Simple Refunds together: Al-Maarej provided the infrastructure (the channel and orders spreadsheet), while Vidal and his staff did most of the refunding work. *Id.* Al-Maarej and Vidal agreed on a 30-70 split of the

profits (with Al-Maarej keeping 30%). *Id.* Al-Maarej eventually sold Simple Refunds to Vidal on December 28, 2022. Haynes Aff. ¶ 17 & Ex. 101, at 25.

### 9. Al-Maarej personally gained more than $1.7 million from the Simple Refunds scheme.

#### a. Retailers lost $2,951,090.77 to Simple Refunds, and Al-Maarej personally collected at least $387,037.16 of that in fees.

As noted, tallied vouches show Simple Refunds defrauded victim retailers by $2,951,090.77 under Al-Maarej's leadership. Haynes Aff. ¶ 50. Al-Maarej collected fees on those refunds through Zelle, Venmo, Cash App, and cryptocurrency. Haynes Aff. ¶ 38.

Zelle payments from Simple Refunds customers are readily identifiable in Al-Maarej's bank accounts. For example, Exhibit 201 to the Agbayani Affidavit is three months of statements from Al-Maarej's Capital One bank account—April 2022 through June 2022. In those three months, Al-Maarej received 290 small-dollar Zelle transfers from dozens of individuals. Agbayani Aff. ¶ 6 & Ex. 201. Those payments total $254,388.84. *Id.* Each of these transactions is consistent with a Simple Refunds payment, and many are from known Simple Refunds customers. *Id.* ¶¶ 6 & 8.

Al-Maarej received a total of $598,949.42 in Zelle transactions from the end of 2019 to 2023, with most of those deposits clustered in 2022, when Simple Refunds was at its most profitable. Agbayani Aff. ¶ 9. Many of these payments are consistent with a payment from a Simple Refunds customer. *See* Agbayani Aff. Ex. 202. Of this $598,949.42, law enforcement identified $286,622.50-worth of Zelle payments from *known* Simple Refunds customers; individuals agents identified using the Simple Refunds Google orders data. Agbayani Aff. ¶ 11 & Ex. 203. This lower figure omits payments law enforcement couldn't precisely trace to Simple Refunds because, for example, the customer effectively used a Telegram moniker and ghost email accounts to conceal their identity.

Simple Refunds also accepted Venmo. Law enforcement identified $177,890.70 in Venmo deposits to Al-Maarej's account that are consistent with Simple Refunds payments.

Agbayani Aff. ¶¶ 12 & Ex. 204. People sending payments through Venmo (owned now by PayPal) have an option of including notes with the transaction. Agbayani Aff. ¶ 13. Reviewing data from Al-Maarej's Venmo account, law enforcement noticed that Simple Refunds customers such as Leonardo Vidal sent Al-Maarej money with the note "lost bet." Agbayani Aff. ¶ 13. Some "lost bet" notes also referenced victim retailers, such as "Lost bet (5th,6th,7thcstco). Law enforcement deduced from these patterns that "lost bet" was a payment for refunding services. *Id.* Other notes expressly mentioned victim retailers or Al-Maarej's co-conspirator "Reign." *Id.* The government totaled all the payments from parties with notes indicating this type of connection to fraudulent refunding and determined that Al-Maarej generated **$72,145.33** in income from Simple Refunds Venmo fees. *Id.* & Ex. 205.

Law enforcement performed a similar analysis with CashApp (i.e., Square). Agbayani Aff. ¶ 14. Al-Maarej received $99,963.48 to his CashApp account over the relevant period. *Id.* & Ex. 206. Law enforcement then narrowed the list to known Simple Refunds customers or notes that referenced retailers *Id.* ¶ 15 & Ex. 207. Using this methodology, the government linked **$28,269.33** in CashApp payments to Simple Refunds fees. *Id.* However, many sending accounts used only a first name or initials, and only a few included additional notes in the subject line. *Id.*

The following table summarizes deposits into Al-Maarej's financial accounts that law enforcement identified as fees from Simple Refunds customers. Agbayani Aff. ¶ 16.

| SIMPLE REFUNDS FEES | |
|---|---|
| **Source** | **Total** |
| Zelle deposits | $ 286,622.50 |
| Venmo deposits | 72,145.33 |
| Cash App deposits | 28,269.33 |
| Total | $ 387,037.16 |

United States' Sentencing Memorandum - 17
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

This is a conservative estimate for a few reasons. First, as explained, it omits payments from Simple Refunds customers whom law enforcement couldn't identify because they concealed their identities, such as with Telegram monikers. This was common. *See* Haynes Aff. Ex. 108. Second, as to Venmo and CashApp, it omits payments in which the sender concealed the purpose of the money by declining to include a note or using an emoji rather than a statement like "refunding." Again, this happened a lot. *See* Agbayani Aff. Exs. 204 & 206. Third, it omits payments through cryptocurrency, which law enforcement could not trace as effectively as fiat currency peer-to-peer transactions. Agbayani Aff. ¶ 17.

> b.    *Al-Maarej stole an additional $1,402,728.96 from victim retailers through his personal refunding.*

While he was running Simple Refunds (and collecting fees), Al-Maarej was also obtaining fraudulent refunds directly from victim retailers for his own benefit. Al-Maarej received $1,402,728.96 in fraudulent returns linked to his personal refunding. PSR ¶ 29; Agbayani Aff. ¶ 33.[1]

Al-Maarej's personal refunding served several important purposes in the Simple Refunds scheme. First, he personally tested stores and methods that he later deployed for Simple Refunds customers. A March 2022 go-kart refund provides an example of how this worked. In late-February 2022, Al-Maarej made a $2,331.99 purchase from Segway Inc., which makes Ninebot go-karts, using one of his personal credit cards. Agbayani Aff. ¶ 21 & Ex. 208. That same day, Al-Maarej sought and received a refund of $2,331.99. *Id.* Agents found the same model go-kart in Al-Maarej's garage when they executed a residential search warrant in September 2023. Giboney Aff. ¶ 18 & Ex. 310. In March 2022, a few days later after he refunded the go-kart, Al-Maarej told his followers that "Go Kart Refunds [would be] Coming soon . . ." and posted a picture of the go-kart he personally refunded.

---

[1] The government's final figure is about $100,000 less than the PSR's figure because the PSR's figure inadvertently includes transfers between Al-Maarej's Revolut accounts. The government eliminated those transfers in its final calculation.

1
2
3
4
5
6
7
8
9
10
11



Haynes Aff. Ex. 101, at 11.

Second, Al-Maarej's personal refunding successes lent credibility to his "services" and helped him attract purchasers. For example, in January 2022, Al-Maarej posted to his Telegram followers a copy of a voicemail he received from VC2, bragging "Only at simple refunds we can provide you 70k worth of [VC2] refunds with no rebill (watch the whole thing)." Haynes Aff. Exs. 101, at 3 & 103. 2,700 Telegram users saw the post. *Id.* One user asked Al-Maarej whether that VC2 "voicemail [was] for ur personal orders or a client," Haynes Aff. ¶ 19. Al-Maarej responded: "Mine." *Id.*

Law enforcement tallied Al-Maarej's income from personal refunding by identifying large purchases from victim retailers followed shortly by large (usually identical) deposits from the same retailer. Agbayani Aff. ¶ 26. The government totaled deposits following this pattern that flowed into Al-Maarej's bank accounts, credit cards, and Revolut account. Agbayani Aff. ¶¶ 27–30. Separately, agents sought and obtained records from VC6 for items shipped to Al-Maarej's Dearborn, Michigan residence and subsequently returned. Agbayani Aff. ¶¶ 31–32 & Ex. 212. VC6 confirmed that it issued $537,102.09 in refunds on orders shipped to Al-Maarej's home. *Id.* & Ex. 213.

United States' Sentencing Memorandum - 19
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

From these four sources, law enforcement identified a total of **$1,402,728.96** in refunds Al-Maarej personally received from victim retailers, as shown in the chart below.

| AL-MAAREJ GAIN FROM REFUNDING ACTIVITY | |
| --- | --- |
| AL-MAAREJ REFUNDING ACTIVITY: | |
| BANK TRANSACTIONS | $ 260,213.52 |
| CREDIT CARD TRANSACTIONS | 562,953.03 |
| REVOLUT TRANSACTIONS | 42,460.32 |
| HOME DEPOT TRANSACTIONS | 537,102.09 |
| SUBTOTAL AL-MAAREJ REFUNDING ACTIVITY | $  1,402,728.96 |

### 10.    Al-Maarej spent fraud proceeds on jewelry, a car, a condo, and expensive travel.

Al-Maarej lived lavishly on his fraud proceeds. Although he had minimal legitimate income, he bought a condominium worth $171,000 and a Cadillac Escalade for about $75,000. PSR ¶¶ 30, 82. Al-Maarej traveled to Turkey and South America during the fraud and adorned himself with ostentatious jewelry, including a Rolex watch to which he added diamonds and a diamond set David Yurman curb chain necklace. PSR ¶ 30; Giboney Aff. ¶ 15. When agents searched Al-Maarej's home in September 2023, they found about $135,000 in cash, a designer jacket Al-Maarej fraudulently refunded, and the go-kart discussed above. Giboney Aff. ¶¶ 8–11, 17–18. Al-Maarej frequently boasted about his ostentatious lifestyle on Telegram, once posting a video of @sxjed flying in a private jet. Haynes Aff. Ex. 102.

### B.    Procedural History

In September 2023, a grand jury sitting in the Western District of Washington indicted Al-Maarej for one count of Conspiracy to Commit Wire and Mail Fraud, four counts of Wire Fraud, and three counts of Mail Fraud. Dkt. No. 1.

United States' Sentencing Memorandum - 20
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

In July 2023, Al-Maarej pled guilty to all eight counts in the Indictment without a plea agreement. Dkt. No. 33. Al-Maarej admitted in a statement of facts accompanying his guilty plea that he helped Simple Refunds customers obtain fraudulent refunds by misrepresenting the status of the ordered product to the victim retailer. Dkt. No. 33, at 4–5. Al-Maarej purchased items for himself "and obtained refunds while keeping the items." Dkt. No. 33, at 5. Al-Maarej admitted that this conduct constituted conspiracy, wire fraud, and mail fraud as charged in the indictment. *Id.*

The parties informed the Court that an evidentiary hearing would be required to resolve several disputed issues at sentencing. The Court set sentencing for December 19, at 9:30 a.m. The government intends to call the following witnesses: FBI Investigative Analyst Margaret Haynes and FBI Forensic Accountant Aireen Agbayani.

## II.    STANDARDS OF PROOF AT SENTENCING

The United States will present testimony and evidence at sentencing to support certain guidelines calculations, as well as to help the Court understand the nature and scope of Al-Maarej's fraud.

The Court applies a preponderance of the evidence standard at sentencing. *United States v. Lukas*, 101 F.4th 1158, 1159 (9th Cir. 2024) (en banc). After *Lukas*, "clear and convincing evidence is not required for factual findings under the Guidelines, even when potentially large enhancements are at stake; fact-finding by a preponderance of the evidence is sufficient to satisfy due process at sentencing." *Id.* at 1163.

Neither the Federal Rules of Evidence nor the Confrontation Clause apply at sentencing hearings. *United States v. Franklin*, 18 F.4th 1105, 1114 (9th Cir. 2021); *see also* USSG § 6A1.3(a) ("[T]he court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."). "Hearsay is generally admissible" at such hearings. *Id.* "Nevertheless, due process requires that some minimal indicia of reliability accompanying a hearsay statement introduced at

United States' Sentencing Memorandum - 21
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

sentencing." *Id.* Such indicia may come in the form of corroborating evidence (business records), defendant's own statements, or co-conspirator statements. *Id.* "The defendant typically has the burden to show that the disputed hearsay is false or unreliable." *Id.*

Relatedly, the Court may accept any undisputed portion of the presentence report as a finding of fact. Fed. R. Crim. P. 34(i)(3). And to the extent the defendant objects to allegations in the presentence report, the "defendant bears the burden of first showing that the disputed information is . . . false or unreliable." *United States v. Kimball*, 975 F.2d 563, 567 (9th Cir. 1992) (citation and internal quotation marks omitted); *Farrow v. United States*, 580 F.2d 1339, 1360 (9th Cir. 1978) ("due process does not require an evidentiary hearing to establish the veracity of all information in a presentence report").

## III.    SENTENCING GUIDELINES CALCULATIONS

The parties dispute two United States Sentencing Guidelines provisions: First, whether Al-Maarej's scheme caused a total fraud loss of between $3.5 million and $9.5 million, which requires an eighteen-level increase under USSG § 2B1.1(b)(1)(J). Second, the parties dispute whether Al-Maarej qualifies as a leader or organizer under USSG § 3B1.1(a), which requires a four-level increase (and disqualifies him for the two-point reduction for zero-point offenders). The government agrees with the United States Probation Office that both provisions apply here.

## A.    Loss Calculation

The total fraud associated with Al-Maarej's fraudulent refunding scheme is **$4,353,819.73**, well over the $3.5 million required to trigger an eighteen-point increase under USSG § 2B1.1(b)(1)(J). The loss comes from two sources: $2,951,090.77 derives from fraudulent refunds Al-Maarej and others facilitated through Simple Refunds and an additional $1,402,728.96 comes from Al-Maarej's personal refunding. Al-Maarej disputes the vouches-based figure; he does not dispute the personal refunding figure. *See* PSR, Def. Obj. 1.; PSR ¶ 29.

United States' Sentencing Memorandum - 22
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The Court "need only make a reasonable estimate of the loss," at sentencing. USSG § 2B1.1(b)(2), cmt. n. 3(B); *United States v. Tadios*, 822 F.3d 501, 503 (9th Cir. 2016). That estimate "shall be based on all available information," USSG § 2B1.1(b)(2), cmt. n. 3(B), and is often more art than science, *see United States v. Nikulin*, No. 20-10322, 2021 WL 6102091, at *1 (9th Cir. 2021) (affirming loss calculation based on the "size of the victim companies, the nature of their responses to the computer intrusions, and their statements of costs associated with their responses"); *United States v. Hansen*, No. 22-30102, 2024 WL 3423222, at *3 (9th Cir. 2024) (no error when district court refused to discredit government's evidence of loss based on the testimony of a single defense expert).

### 1.    Vouches ($2,951,090.77)

The Simple Refunds vouches provide more than a "reasonable estimate" of loss; they are a precise accounting of fraudulent refunds under AL-Maarej's Simple Refunds. Vouches are images of receipts of successful refunds, usually complete with the amount of the refund, the targeted store, and the products refunded. Haynes Aff. ¶¶ 42–44 & Ex. 113.

The government took screenshots of vouches dating back to September 2020. *Id.* ¶ 45. When a vouch showed the amount of a successful fraudulent refund, the government entered the data into the spreadsheet. *Id.* ¶ 46. With this data, the government tabulated the total value of fraudulent refunds Simple Refunds facilitated before Al-Maarej sold the channel to Vidal. Haynes Aff. ¶ 47 & Ex. 114. The government also assigned loss to each victim retailer. *Id.* Because vouches usually displayed the precise amount of loss associated with the imaged transaction, these loss calculations are down to the penny. *See id.* The government's detailed spreadsheet shows $2,951,090.77 in loss attributable to Al-Maarej's Simple Refunds. Haynes Aff. Ex.114.

Al-Maarej suggested in his objections to the PSR that the vouches are unreliable boasts, but that is not the case. The vouches are not Al-Maarej's mere unsubstantiated boasts about his refunding successes—they are images of receipts the victim retailers issued Al-Maarej's customers. Courts can, and often do, base loss calculations on less

United States' Sentencing Memorandum - 23
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

precise evidence. *See Nikulin*, No. 20-10322, 2021 WL 6102091, at \*1 (victim's own unsworn estimates sufficient to support loss).

And several pieces of evidence support the conclusion that Simple Refunds caused more than $2.9 million in losses to victim retailers. First, the Simple Refunds order spreadsheet shows Simple Refunds customers requested about $2,923,861 in fraudulent refunds between February 23, 2022 (when Al-Maarej launched the intake system) and December 28, 2022 (when he withdrew from the conspiracy). *See supra* § I.A.4; Haynes Aff. ¶ 32. Each request is fairly included in the fraud loss figure. USSG § 2B1.1(b), note A ("Loss is the greater of actual loss or intended loss."). That the orders spreadsheet figure is almost identical to the vouches indicates both are reliable measures of fraud loss.

Second, information from Al-Maarej's bank accounts supports the $2.9 loss figure. Simple Refunds charged its customers a fee of between 15% and 25% of the value of the successful refund; Al-Maarej accepted many payments directly to his financial accounts through Zelle, Venmo, and CashApp. If the total value of fraudulent refunds was $2.9 million, Al-Maarej and his co-conspirators would have collected about $580,000 in Simple Refunds fees ($2,900,000 \* 20%). Agbayani Aff. ¶ 18. As expected, law enforcement identified about $590,000 in Zelle transactions flowing into Al-Maarej's account. Agbayani Aff. ¶ 9. Of that figure, more than $280,000 tied to known Simple Refunds customers. *Id.* ¶ 11. Law enforcement found similar payment patterns in Al-Maarej's Venmo and CashApp accounts. Agbayani Aff. ¶¶ 12–16. The government ultimately identified about $870,000 in payments flowing into Al-Maarej's Zelle, Venmo, and CashApp accounts, $387,037.16 of which law enforcement tied to Simple Refunds transactions. Agbayani Aff. ¶ 16. This figure is entirely consistent with Simple Refunds losses of $2.9 million, and further supports the government's fraud loss calculation.

### 3.    Personal refunding ($1,402,728.96)

Al-Maarej does not dispute that he earned **$1,402,728.96** from his personal refunding, PSR ¶ 29, and there is ample evidence to support that calculation.

Al-Maarej's personal refunding activity is a separate bucket of loss from the Simple Refunds vouches. When Simple Refunds facilitated a refund for one of its customers, the proceeds of that fraudulent transaction went into the purchaser's financial account (just like with a typical refund). Al-Maarej earned money on those transactions from the fees he charged; those fees appear in Al-Maarej's bank accounts as Zelle, Venmo, and CashApp transfers. Agbayani Aff. ¶¶ 5–6. By contrast, when Al-Maarej obtained a fraudulent refund for himself, the proceeds from that transaction flowed directly from the retailer issuing the refund to Al-Maarej's financial account. Agbayani Aff. ¶¶ 23 & 26. Unlike losses associated with Simple Refunds fees—for which Al-Maarej gained approximately $.20 on each dollar lost by a victim retailer—each dollar of income from personal refunding activities represents a corresponding loss to the victim retailer.

Both figures (Simple Refunds vouches and Al-Maarej's personal refunding proceeds) are properly included in fraud loss because Al-Maarej's personal refunding was part of the overall conspiracy to which he pled guilty. *See* Notice of Intent To Enter a Guilty Plea (Dkt. No. 33), at 5 ("Mr. Al-Maarej also purchased items himself and obtained refunds while keeping the items.").

The government identified patterns of fraudulent refunding in Al-Maarej's bank accounts, credit cards, and Revolut accounts. Agbayani Aff. ¶ 26. Al-Maarej would make a large-dollar purchase from a victim retailer and shortly thereafter receive a refund deposit from in the same amount of the purchase. *Id.* Although obtaining periodic refunds from e-commerce companies is not unusual, the volume and regularity of refunds coming into Al-Maarej-associated accounts—coupled with his history on Simple Refunds—strongly suggests that his repeated ongoing refunding activity is fraudulent. Agbayani Aff. ¶ 27.

Using this pattern, the government tabulated income from refunds in Al-Maarej's bank accounts, credit cards, and Revolut account. Agbayani Aff. ¶¶ 28–30 & Exs. 209–211. The government did not include refunds from VC6 in this analysis because law enforcement obtained information about Al-Maarej's fraudulent returns directly from VC6.

Agbayani Aff. ¶¶ 31–32. VC4 identified dozens of items shipped to Al-Maarej's address in Dearborn, Michigan. *Id.* & Ex. 212. Some items shipped to "Sajed Almaarej," but others shipped to various aliases including Saj Alma, Sam Almaa, and Sam Al. *Id.* (Raw Data Tab). Al-Maarej tricked VC6's fraud filter by using these aliases, a variety of billing email addresses (e.g., saalmaarej[@]yahoo.com and sxjed1[@]hotmail.com), and by adding fake suites or apartments to his address. *Id.*; Agbayani Aff. Ex. 213. VC6 tabulated refunds issued on items shipped to Al-Maarej's address and found that the total loss was $537,102.09. With losses from VC6, the total losses attributable to Al-Maarej's personal refunding is **$1,402,728.96**. *See* Supra § I.A.12.

The total fraud loss from both independent buckets—Simple Refunds vouches and Al-Maarej's personal refunding—is **$4,353,819.73**.

## B.    Leadership

The parties also dispute whether Al-Maarej qualifies for a four-point leadership enhancement under USSG § 3B1.1(a). To impose the organizer or leader enhancement, "there must be evidence that the defendant exercised some control over others involved in the commission of the offense **or** was responsible for organizing others for the purpose of carrying out the crime." *United States v. Tat*, 97 F.4th 1155, 1162 (9th Cir. 2024). Al-Maarej falls solidly into both buckets.

### 1.    Al-Maarej was a leader.

First, Al-Maarej was a leader because he "exercised some control over others" involved in the crime. *Tat*, 97 F.4th at 1162. Al-Maarej repeatedly referenced his "workers" on the Simple Refunds Telegram channel. *See* Haynes Aff. Ex. 110. For example, in March 2022, Al-Maarej explained that "my workers" would continue running Simple Refunds when he was on vacation: "March 16th-21st I will be out of the office and out of the country, I will answer DMs when I can but my workers will be doing orders, expect delays between those days, thank you." *Id.*, at 1. Al-Maarej even delegated primary responsibility over the site to worker @Kojxx when Al-Maarej was out. *Id.*, at 2; *see also id.* at 3 (Al-

United States' Sentencing Memorandum - 26
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Maarej posting that "my workers" are processing delayed orders). At the same time, Al-Maarej was the self-proclaimed "owner" of Simple Refunds. *See, e.g.*, Haynes Aff. Ex. 110. Al-Maarej's description of the Simple Refunds hierarchy—with him as the "owner" and other people as "workers"—is powerful evidence of his leadership role. *See United States v. Kirilyuk*, No. 19-10447, 2022 WL 993574, at *2 (9th Cir. 2022) (ample evidence to support this enhancement because, among other evidence, defendant "once described himself as someone who 'organize[s] the work'").

Al-Maarej also, by his own admission, trained employees. In April 2022, he posted: "Good morning , got some errands to run, **teaching new worker today** . . . ." Haynes Aff. Ex. 110, at 4. Al-Maarej also developed and launched the Simple Refunds mentorship program. As to that program, he wrote "Learn how to create you're [sic] refunding service ad or you can have a chance to **work for us** and get paid until you're ready to be on your own." Haynes Aff. Ex. 112, at 1. Again, by Al-Maarej's own statement, the mentorship program was an opportunity for Al-Maarej to train and recruit additional workers. *Id.*

Someone who trains and manages employees, as Al-Maarej did here, qualifies as a leader under USSG § 3B1.1(a). *See* USSG § 3B1.1, cmt. n.4 (factors to consider in evaluating leadership include "recruitment of accomplices" and "the degree of control and authority exercised over others"); *United States v. Ruiz*, 620 F. App'x 577, 579 (9th Cir. 2015) (sufficient evidence to support enhancement when defendant "trained at least five employees" in illegal venture); *United States v. Alston*, 248 F. App'x 396, 398 (3d Cir. 2007) (enhancement applies when defendant trained employees in the fraud and owned the relevant business that benefitted from the fraudulent scheme).

Al-Maarej also owned Simple Refunds, exercised decision-making authority over how the site operated, and kept a large share of the proceeds, each of which confirms he was a leader. *See* USSG § 3B1.1, cmt. n.4 (listing factors for courts to consider). Al-Maarej was the self-proclaimed owner of Simple Refunds from when the site opened until December 28, 2022, when he sold the channel to Leonardo Vidal. *See* Haynes Aff. Exs.

United States' Sentencing Memorandum - 27
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

101 & 102. His authority to sell the venture confirms that he owned and led it. Al-Maarej also developed and controlled the infrastructure on which Simple Refunds ran, from the Telegram channels to the Google-based order intake system. Supra § 1.A.4. As the Simple Refunds owner, he decided how the site operated, such as by switching the orders intake method, Haynes Aff. Ex. 101, at 7 (announcing Google Form), moving Simple Refunds between platforms (from Telegram to Discord and back), Haynes Aff. Ex. 101, at 2, purchasing and consolidating rival refunding sites, Haynes Aff. Ex. 101, at 15, launching marketing gimmicks, Haynes Aff. Ex. 101, at 16 (bitcoin raffle), and guiding purchasers on different types of refunds, Haynes Aff. Ex. 101, at 20 (counseling purchasers on VC1 instant). Finally, as noted, Al-Maarej personally gained at least $380,000 worth of fees from identified Simple Refunds customers, a conservative estimate. Agbayani Aff. ¶ 16.

### 2. Al-Maarej was an organizer.

Even independent of his leadership role, Al-Maarej qualifies for the four-point increase because he organized others to participate in the Simple Refunds conspiracy. USSG § 3B1.1(a) (enhancement applies to organizer *or* leader). An organizer is someone who has "the ability and influence necessary to coordinate the activities of others to achieve the desired result." *United States v. Vinge*, 85 F.4th 1285, 1287 (9th Cir. 2023).

United States' Sentencing Memorandum - 28
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Here, Al-Maarej coordinated the activities of thousands of Simple Refunds purchasers. He owned Simple Refunds, signed every single post on the channel until June 2022, developed an order intake system to organize purchaser information, tested and deployed refunding methods, and personally accepted payments. Haynes Aff. ¶¶ 15–16, 21–25, 27–29; Agbayani Aff. ¶¶ 5–8. Al-Maarej also counseled purchasers how to effectively facilitate certain types of returns, therefore influencing their fraudulent conduct. For example, Al-Maarej advised customers that to obtain an instant refund for VC3 Apple products, the order minimum was "$1.5k" and needed to be shipped "No freight." Haynes Aff. Ex. 101, at 4. Al-Maarej even directed his purchaser how to evade retailer fraud enforcement, as shown in the following post:



Haynes Aff. Ex. 101, at 6.

Finally, even if Al-Maarej's relationship with his workers was horizontal as defense contends, he certainly coordinated those workers and their participation in the fraud. Al-Maarej provided his workers a platform on which to engage in fraud—the Simple Refunds Telegram channels. Al-Maarej collected purchaser data for the workers' use and received payments. As the owner of Simple Refunds, Al-Maarej had the authority necessary to coordinate the criminal activity, for example, by sharing access to the Simple Refunds

United States' Sentencing Memorandum - 29
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

orders data (which lived on Al-Maarej's Google Drive). Haynes Aff. ¶ 30 & Ex. 107. Even a collaborative group can have an organizer. *See, e.g.*, *United States v. Vinge*, 85 F.4th 1285, 1287 (9th Cir. 2023); *United States v. Doe*, 778 F.3d 814, 825 (9th Cir. 2015).

*Vinge* is instructive here. 85 F.4th at 1287. Vinge was caught importing drugs from the mainland United States to Hawaii. *Id.* He told law enforcement "he would reach out to his source on the mainland, pool money from his friends on the island who 'want[ed] to put in and buy something,' place the order, set the price, and then distribute the drugs once they arrived." *Id.* On appeal, Vinge argued the district court erred by applying a two-level organizer / leader enhancement under USSG § 3B1.1(c). *Id.* at 1288. The Ninth Circuit disagreed. It reasoned that *Vinge* organized others in the criminal conspiracy by gathering up their money, placing the orders, tracking the drugs, and distributing them once they arrived. *Id.* at 1290. So too here. Al-Maarej organized others in the criminal conspiracy by coordinating purchasers, collecting purchaser orders, providing that information to Simple Refunds workers so they could complete the refund, and taking payments from customers. So, entirely separate from his conduct as a leader, Al-Maarej is subject to the four-point enhancement as an organizer.

### 3.    The fraud involved five or more participants or was otherwise extensive.

Al-Maarej does not dispute that the fraud involved five or more participants or was otherwise extensive, USSG § 3B1.1(a), nor would he have grounds to do so. More than a thousand people subscribed to the Simple Refunds main Telegram channel when @sxjed owned it, and Al-Maarej facilitated fraudulent returns for dozens of Simple Refunds purchasers. Haynes Aff. ¶ 17 & Ex. 101, at 25. Each of these purchasers was a participant. *See* USSG § 3B1.1, cmt. n. 1 (purchaser is anyone who is criminally liable). In any event, the fraud was otherwise extensive. Al-Maarej, his "workers," and dozens of purchasers targeted more than fifty victims in many different states, resulting in a total loss that exceeded $4.3 million. *United States v. Booth*, 309 F.3d 566, 577 (9th Cir. 2002) (scheme

United States' Sentencing Memorandum - 30
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

was extensive when it involved more than ten employees (albeit unknowing) and large geographical reach).

**C.    Uncontested guidelines calculation**

The government agrees with the U.S. Probation Office that the following additional guidelines apply: ten or more victims (USSG § 2B1.1(b)(2)(A) and sophisticated means (USSG § 2B1.1(b)(10)(C).

The victims of Al-Maarej's scheme are readily identifiable from the Simple Refunds vouches: most vouches lists the victim retailer defrauded and the loss associated with the transaction. Using this method, law enforcement identified more than 50 victims of the fraud. Haynes Aff. Ex. 114.

The offense also involved sophisticated means. *See* USSG § 2B1.1(b)(10)(C), cmt. n. 9(B). Al-Maarej developed a complicated order intake system, tested and deployed a variety of refunding methods, accepted payments through cryptocurrency, and used an online moniker and fraudulent email address to conceal his identity. The scheme resulted in more than $4.3 million in losses for retailer victims around the country.

**D.    Summary of Al-Maarej's guidelines calculation**

The following table summarizes Al-Maarej's guidelines calculation as determined by the government and the U.S. Probation office:

| Description | Citation | Impact |
|---|---|---|
| Base offense level | USSG §§ 2X1.1(a), 1B1.1(a)(1) | +7 |
| Loss exceeded $3,500,000 but was less than $9,500,000 | USSG § 2B1.1(b)(1)(J) | +18 |
| Offense involved ten or more victims | USSG § 2B1.1(b)(2)(A) | +2 |
| Sophisticated means | USSG § 2B1.1(b)(10)(C) | +2 |
| Organizer or leader in offense that involved five or more participants or was otherwise extensive | USSG § 3B1.1(a) | +4 |

United States' Sentencing Memorandum - 31
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| Acceptance of responsibility | USSG § 3E1.1(a), (b) | -3 |
|---|---|---|
| **TOTAL OFFENSE LEVEL** | | **30** |

Al-Maarej does not have any criminal history, so his criminal history category is I. Total offense level of 30 and a criminal history category I yields a guidelines range of 97-121 months.

## IV.    RATIONALE FOR SENTENCING RECOMMENDATION

Although Al-Maarej's crime was significant, a within-guidelines sentence is not necessary here to serve the goals of 18 U.S.C. § 3553(a). The government respectfully requests the Court sentence Al-Maarej to 78 months in prison and three years of supervised release under the conditions recommended by the U.S. Probation Office.

### A.    Al-Maarej's offense was serious.

Four aspects of Al-Maarej's crime are particularly aggravating and warrant the recommended 78-month sentence.

First is the fraud's breadth, scope, and sophistication. Al-Maarej led a group of Simple Refunds workers and followers to steal more than $4.3 million from dozens of victim retailers. Al-Maarej's crime was not a momentary lapse in judgment. Rather, this staggering feat lasted years—from September 2020 until the summer of 2023.

Al-Maarej poured significant effort and brainpower to cultivate a criminal enterprise that would run smoothly, enabling him and his followers to exact maximum financial pain on their victim retailers, while avoiding detection. Al-Maarej used an online moniker—sxjed—to conceal his identity from law enforcement and retailers. He tested different platforms for his scheme and landed on Telegram because it afforded anonymity and an ability to contact a large audience. When the volume of orders became overwhelming, Al-Maarej created a Google-based intake system that helped him organize orders and share information with his workers. Al-Maarej and his co-conspirators even kept a catalogue of their victims—the Simple Refunds Store List—that included information on how Simple

United States' Sentencing Memorandum - 32
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Refunds purchasers could more effectively execute the fraud (e.g., "no freight items"). Haynes Aff. Ex. 109, at 8. Al-Maarej also carefully honed his refunding methods, prodding his victims' weaknesses to find the most reliable way of obtaining fraudulent refunds for himself and his customers. He bought computer scripts to automate the manual process of refunding, which likely helped build capacity for more fraud. Giboney Aff. Ex. 312. He worked with USPS and UPS employees to facilitate specific refunding methods, and even recruited victim company employees to help him understand their employers' weaknesses. Haynes Aff. Ex. 111. These steps reveal a crime that was deliberate and calculating.

Second, Al-Maarej's role in the offense is also an important aggravating factor. As explained in more detail above, Al-Maarej was the undeniable leader of the scheme: He owned Simple Refunds, managed workers, and created an organizational structure that facilitated the fraud on a massive scale. This role increases his culpability for the crime and militates in favor of a lengthy sentence.

But Al-Maarej's role went beyond a typical leader because he recruited hundreds—maybe thousands—of people to the fraud. Al-Maarej targeted a refunding community made up of 18–24-year-old-men, many of whom lived their lives primarily online. He billed refunding as a safe and easy way to make money. Each post on the Simple Refunds Telegram channel, which was accessible to anyone with an Internet connection, was designed to draw more people into the fraud. In spring 2022, for example, he boasted: "So far processed 10k worth of [VC1] MacBooks today and still not done for the day, if your not ordering MacBooks and taking advantage of this instant refund opportunity, I'm sorry but your [sic] missing out." Haynes Aff. Ex. 101, at 13. 904 people viewed the post. *Id.* Al-Maarej even raffled off bitcoin to followers who were willing defraud VC1. Haynes Aff. Ex. 101, at 16. He bragged publicly about his wealth and his own refunding successes.

Al-Maarej even hosted a mentorship program to train the next generation of refunders in everything "fraud related," including "cleaning your money." Haynes Aff. Ex. 112. All this boasting worked. The first post on the Simple Refunds vouches channel in

United States' Sentencing Memorandum - 33
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

September 2020 had 223 views. Haynes Aff. Ex. 113, at 1. By June 2022, Al-Maarej built his following to more than 1,000 subscribers, and even routine posts got more than 1,200 views. *See, e.g.*, Haynes Aff. Ex. 101, at 22. Through his posts, Al-Maarej told his followers, day in and day out, that the only way to get ahead in life is to cheat.

Third, Al-Maarej's refunding fraud had a significant impact on the victim retailers. VC3, a local retailer, identified retail return fraud as its "number one fraud problem" in May 2023. Haynes Aff. Ex. 115, at 3. Perpetrators—most of whom were 18-24 year old men—targeted high-value electronics. *Id.* Circumstances during the pandemic made the fraud difficult to track and particularly harmful for the retailer and its customers. *Id.* at 1–2. The retailer estimated it lost $23 million to refunding fraud in just a few months in 2021. *Id.* VC6 changed its refunding policies after experiencing retail return fraud, Agbayani Aff. Ex. 213, to the detriment of many customers. Although many of Al-Maarej's victims were large companies, many others were small retailers with thin margins. One such victim informed law enforcement that retail return fraud was the most common form of fraud it experienced, and the frequency of fraud increased over time. Haynes Aff. Ex. 116. Refunding fraud doesn't just impact retailers; those companies often pass costs to consumers.

Finally, Al-Maarej was motivated by greed. Al-Maarej personally made more than $1.7 million running Simple Refunds and doing his own fraudulent refunding on the side. He spent this money lavishly. Al-Maarej used proceeds from Simple Refunds fees to buy himself a $75,000 Escalade, pictured below.



United States' Sentencing Memorandum - 34
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Giboney Aff. Ex. 301, at 3. He bought expensive jewelry like a diamond inlaid David Yurman necklace. Giboney Aff. Ex. 307. When agents searched AL-Maarej's home in September 2023, they found stacks of cash stored in two safes. Giboney Aff. ¶¶ 9, 11. Al-Maarej also bought a condo in Dearborn worth more than $170,000. PSR ¶ 82. When law enforcement searched that condo in September 2023, they found an expensive leather couch and other items reflecting Al-Maarej's flashy lifestyle. Giboney Aff. Ex. 311. Al-Maarej bragged about his wealth to his hundreds of Telegram followers, at one point posting a video of him flying in a private jet. Haynes Aff. Ex. 102.

Although Al-Maarej's crime was serious, aspects of his history and characteristics support the below-guidelines recommendation. The PSR documents a difficult childhood. PSR ¶¶ 57–65. Al-Maarej is still in his 20s, which means his brain hasn't fully matured. This too lowers his culpability for crime and the necessary punishment, which is why the government is recommending a below-guidelines sentence.

## B.    A lengthy prison sentence is necessary to promote respect for the law and deterrence.

Deterrence is an important factor here as well. Al-Maarej committed this crime, over a long period of time, even though he plainly knew what he was doing was wrong. How could he not? He lied to more than fifty retailers hundreds of times on behalf of dozens of Simple Refunds customers. Retailers consistently warned Al-Maarej and his followers to stop. For example, an investigator from VC3 called Al-Maarej in early 2022 asking why he returned $70,000 worth of merchandise and warning that VC3 would pursue the matter if Al-Maarej didn't respond. Haynes Aff. Ex. 103. Retailers frequently banned Al-Maarej and his customers from their online stores.

Instead of taking his victim's efforts as a reason he should exit the crime, Al-Maarej publicly mocked them. He posted the VC3 voicemail to Telegram and boasted that only he could secure $70,000 in fraudulent returns without a rebill. Haynes Aff. Ex. 101, at 3. When VC3 investigations messaged Al-Maarej's customers about their fraud, he counseled:

United States' Sentencing Memorandum - 35
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

"don't worry they can't rebill you or do any kind of legal action, just ignore and stop ordering from that account." Haynes Aff. Ex. 101, at 6. VC5 associated a customer's order "with a screenshot/voucher found on a professional refunding service page." Haynes Aff. Ex. 101, at 9. Al-Maarej posted the email on Telegram and commented: "🤣 🤣 🤣 🤣 look at this Bullshit Scare tactic 😂 😂 [VC5] send me your btc address let me donate y'all sound hurt." *Id.* Al-Maarej refused to post vouches for VC5 because "of a worker or snitch in my vouches Channel." Haynes Aff. Ex. 101, at 20. In April 2022, when Al-Maarej was doing tens of thousands of dollars a day in VC1 instant refunds, he posted a stack of cash and the comment "🙏 Everyone Eatin' Off [VC1] 💰." Haynes Dec. Ex. 101, at 17. Al-Maarej's distain for his victims and efforts to evade their enforcement measures supports the need for a serious sanction.

Relatedly, Al-Maarej has not fully accepted responsibility for his crimes. Although he pled guilty, he refused to admit the amount of fraud loss or that he managed "workers," necessitating an evidentiary hearing at sentencing. Al-Maarej's lack of remorse supports the requested sentence.

The need for general deterrence also supports the requested lengthy sentence. *See United States v. Onuoha*, 820 F.3d 1049, 1056 (9th Cir. 2016) ("A conviction and resulting sentence serves more purposes than the incapacitation, specific deterrence, and rehabilitation of an individual; general deterrence of the serious crime at issue here is also an important consideration."). General deterrence is especially important in this case because Al-Maarej cultivated an entire online community of refunders, any of whom could have created their own refunding service. Indeed, one of the perks of the Simple Refunds mentorship program was "Learn how to create you're [sic] refunding service and or you can have a chance to work for us and get paid until you're ready to be on your own." Haynes Ex. 112. Al-Maarej trained Leonardo Vidal through a mentorship program. Vidal used these lessons to launch his own refunding service called Ressu Refunds, which defrauded retailers by more than $5.3 million. PSR ¶ 26; *United States v. Vidal*, 24-cr-100,

Dkt. No. 11 ¶ 8(t). Al-Maarej's cohort must see that the Court takes his fraud seriously or they will have incentive to repeat his crimes.

**C.    The requested sentence provides restitution to the victims.**

Along with 78 months in prison, the government requests $4,353,819.73 in restitution to the victims. The Mandatory Victim's Restitution Act provides that "the court shall order . . . that the defendant make restitution to the victim of the offense" when the offense of conviction is one listed in the statute. 18 U.S.C. § 3663A(c)(1)(B). A victim under the MVRA is "any person directly harmed by the defendant's criminal conduct in the course of the scheme." 18 U.S.C. § 3663A(a)(1)-(2). The amount of restitution is calculated based on the victim's actual loss. *See United States v. Gagarin*, 950 F.3d 596, 607 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2729, 210 L. Ed. 2d 887 (2021). A district court has "wide discretion in fashioning restitution orders." *United States v. Grovo*, 826 F.3d 1207, 1221 (9th Cir. 2016). The government is required to prove the amount of the victim's loss for restitution purposes by a preponderance of the evidence. *See United States v. Peterson*, 538 F.3d 1064, 1075 (9th Cir. 2008).

The government requests that the Court enter a restitution order in the amount of $4,353,819.73 in favor of the victim companies. The requested restitution matches the government's fraud loss calculation. $2,951,090.77 comes from Simple Refunds vouches. Each dollar vouched represents a dollar the victim lost to a fraudulently induced refund. Haynes Aff. ¶ 43. The other $1,402,728.96 comes from Al-Maarej's personal refunding proceeds. Agbayani Aff. ¶ 32. Each refund Al-Maarej fraudulently obtained represents a corresponding loss to the victim company. *Id.* The government will provide a list of the victim companies and the specific amounts owed at the time of sentencing.

## V.    FORFEITURE

The government requests the Court enter a forfeiture money judgment in the amount of **$1,789,766.12**, reflecting Al-Maarej's personal gain from the fraud. Like restitution,

United States' Sentencing Memorandum - 37
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

forfeiture is a mandatory element of Al-Maarej's sentence. *See United States v. Feldman*, 853 F.2d 648, 663–64 (9th Cir. 1988), cert. denied, 489 U.S. 1030 (1989). Most criminal offenses include mandatory forfeiture provisions as part of a defendant's sentence, and "courts must order forfeiture when a defendant is convicted of a crime that provides for forfeiture as part of the penalty." *United States v. Carter*, 742 F.3d 440, 446 (9th Cir. 2014). Where, as here, a defendant is convicted of fraud offenses, the defendant must forfeit any property "which constitutes or is derived from proceeds traceable" to the offense. 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7), and 1961(1)(B); 28 U.S.C. § 2461(c). In addition to forfeiture of specifically identified property, *see* Dkt. No. 41, the United States also seeks a forfeiture money judgment of $1,789,766.12, reflecting the proceeds Al-Maarej personally obtained from the fraud.

The evidence establishing Al-Maarej's proceeds is found in the same financial evidence that establishes victim loss for purposes of restitution and is described herein in Section I.A.11–12 and the supporting citations. That evidence proves that Al-Maarej collected at least $387,037.16 in Simple Refund fees collected through Zelle, Venmo, and CashApp and an additional $1,402,728.96 through his personal refunding. Agbayani Aff. ¶¶ 16, 25–33 & Exs. 203–207, 209–213; *see also* PSR ¶¶ 21–22, 26–30.

Neither the underlying facts nor the financial calculations are challenged. Al-Maarej admits that he and others secured fraudulent refunds for retail customers, while permitting the customers to keep the merchandise they ordered, and that these customers paid him a percentage of the value of the refunds. *See* Dkt. No. 33, at 4–5. He admits that he also purchased items himself and obtained refunds while keeping the items. *See id.*, at 5. The evidence establishes that he personally obtained more than $1.7 million in proceeds from these offenses: from Simple Refunds service fees, mentorship program payments, and his own personal refunding activities. *See e.g.*, Dkt. No. 23 ("Giboney Decl."), ¶¶ 26, 31, 34, 45, 46-47.

United States' Sentencing Memorandum - 38
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Al-Maarej must forfeit all proceeds he obtained from the *Conspiracy to Commit Wire and Mail Fraud*, the *Wire Fraud* scheme, and the *Mail Fraud* scheme. Most of these proceeds, however, no longer exist in their original form. After the funds were deposited in various accounts he controlled, they were dissipated, including to purchase the Cadillac, Rolex, and David Yurman chain necklace. *See, e.g.*, Dkt. No. 23 (Giboney Decl.) ¶¶ 50–56; *see also* Giboney Decl. ¶¶ 5–16. For this reason, the United States requests the Court order forfeiture of a forfeiture money judgment, as well as forfeiture of the seized property. *See* Fed. R. Crim. P. 32.2(b)(1)(A). Forfeiture money judgments corresponding to the proceeds of fraud offenses are permissible. *United States v. Nejad*, 933 F.3d 1162 (9th Cir. 2019) (affirming a district court's authority to enter forfeiture money judgments and reciting circuit precedent). "Requiring imposition of a money judgment on a defendant who currently possesses no assets furthers the remedial purposes of the forfeiture statute by ensuring that all eligible criminal defendants receive the mandatory forfeiture sanction Congress intended and disgorge their ill-gotten gains, even those already spent." *United States v. Casey*, 444 F.3d 1071, 1074 (9th Cir. 2006).

In determining the amount of the forfeiture money judgment, the Court may consider any evidence that is "relevant and reliable," including evidence already on the record, evidence presented by the parties for consideration during the forfeiture proceeding, and other reliable information, such as the Presentence Investigation Report. *See* Fed. R. Crim. P. 32.2(b)(1)(B); *see also Newman*, 659 F.3d at 1244–45 (same), *abrogated on other grounds by Honeycutt v. United States*, 137 S. Ct. 1626, 1632 (2017). Because forfeiture is determined post-conviction and is considered part of sentencing, the rules of evidence do not strictly apply to forfeiture proceedings. *See e.g., United States v. Hatfield*, 795 F. Supp.2d 219, 229–30 (E.D.N.Y. 2011) (holding neither the Federal Rules of Evidence nor *Daubert* apply to forfeiture hearings); *United States v. Creighton*, 52 Fed. Appx. 31, 35–36 (9th Cir. 2002) ("[H]earsay evidence is permissible at sentencing and does not, *per se*, lack sufficient indicia of reliability.")

United States' Sentencing Memorandum - 39
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   In calculating a forfeiture money judgment, courts determine—by a preponderance
2   of the evidence—the amount of proceeds an individual defendant obtained from the
3   offense. *See Honeycutt*, 137 S. Ct. at 1635; *United States v. Thompson*, 990 F.3d 680, 691
4   (9th Cir. 2021); *United States v. Prasad*, 18 F.4th 313, 318–19 (9th Cir. 2021). The
5   calculation of a forfeiture amount "does not demand mathematical exactitude." *United*
6   *States v. Ford*, 296 F. Supp.3d 1251, 1260 (D. Or. 2017) (citing *United States v. Treacy*,
7   639 F.3d 32, 48 (2d Cir. 2011)). Courts are "permitted to use general points of reference
8   as a starting point … and may make reasonable extrapolations from the evidence
9   established by a preponderance of the evidence at the sentencing proceeding." *Treacy*, 639
10  F.3d at 48.

    The United States seeks a forfeiture money judgment in the full amount of the
11  proceeds Al-Maarej obtained—$1,789,766.12. The United States will file a Notice of
12  Satisfaction concerning all net proceeds obtained from the forfeiture of specifically
13  identified property (the Subject Property for which the United States seeks a Preliminary
14  Order of Forfeiture), to be credited against the forfeiture money judgment.

United States' Sentencing Memorandum - 40
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

# VI.    CONCLUSION

For all of the reasons set forth above, the governments respectfully recommends the Court sentence Al-Maarej to 78 months in prison, a three-year term of supervised release, order restitution in the amount of $4,353,819.73, and enter a forfeiture money judgment in the amount of $1,789,766.12.

DATED this 12th day of December, 2024.

Respectfully submitted,

SARAH Y. VOGEL
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515

*s/ Lauren Watts Staniar*
LAUREN WATTS STANIAR
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Phone: 206-553-5172
Email: lauren.staniar@usdoj.gov

United States' Sentencing Memorandum - 41
*United States v. Al-Maarej*, CR23-147RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970